DECEMBER TERM, 1840. 563

Hamer, et al. *v.* Johnston, et al.  Marshall *v.* Morton, et al.

## DECEMBER TERM, 1840.

### M. B. HAMER, *et al. v.* JOHNSTON, *et al.*

### J. R. MARSHALL *v.* MORTON, *et al.*

P., about to trade with D., for the note of H., went to H. to inquire if the note was good; H. answered, it was good, and would be paid at maturity; P. thereupon traded for the note, and afterwards assigned it to J. (informing him of H.'s statement), who sued H. thereon; *held,* that H. was precluded by the representations made to P., from setting up as a defence to the suit by J. any failure of consideration between himself and D., the original holder of the note.

THE two cases above stated were submitted to the Chancellor at the same time, the facts in each case being precisely the same, *mutatis mutandis.*

The bill stated, in substance, that Willie Davis proposed to sell to complainants ten sections of land, claimed by said Davis, as assignee of certain Choctaw Indians, who claimed by virtue of the 14th article of the treaty of Dancing Rabbit Creek; and that relying upon the repeated statements of said Davis, that he was in truth an assignee, claiming directly from the said Choctaw Indians, the complainant agreed to purchase said ten sections, for the sum of $9669, to secure which, he gave him his two promissory notes; that said Davis, at the time, executed a bond to convey said ten sections, which is as follows : —

" This instrument of writing witnesseth, that the undersigned has this day sold thirty sections of land, which he claims as assignee of certain Choctaw Indians, who are or were entitled to said lands, by virtue of the 14th article of the treaty of Dancing Rabbit Creek ; that ten sections of said number have been sold to John B. Marshall, ten to M. B. Hamer, five to P. B. Pope, and five to Edward C. Wilkinson ; that said sections are of an undivided interest in a number of sections, which said Davis claims; and that, after the above claims shall have been ratified by the government of the United States, that the said parties are to divide their interests from the said Davis's residuary interest, should he have any, after satis-

fying the claims of the said vendees in the premises, and from that of each, by casting lots for the different locations.".

The said Davis also executed to said Hamer a bond, with the following condition:

" The condition of this obligation is such, that if the said Willie Davis, his heirs, executors, &c. shall make, or cause to be made to the said Malachi B. Hamer, a good and valid title to ten sections of land, claimed by the said Davis, as assignee of certain Choctaw Indians and the United States, at Dancing Rabbit Creek, whensoever the said Davis shall obtain a title to any of said lands himself, or whenever any other person shall obtain a title for his use, then this obligation shall be void; otherwise, to remain in full force and virtue."

The bill charged, that said Davis was not the assignee of the Indians, as he represented, and that he had no title, or pretence of title, which he agreed to sell ; but that an individual named Johnston was the purchaser of a large body of lands from the Indians, and that he took an assignment of the right of said Indians directly to himself and in his own name ; and that, shortly after his said purchase, the said Johnston verbally agreed with the said Davis, to let him have a limited interest in said purchase, provided the said Davis would advance a certain sum of money, to enable the said Johnston ultimately to secure the titles by sanction from the government of the United States ; that Davis never did comply with said conditions, and said Johnston now disclaims any interest on the part of said Davis ; that Davis has died, &c.

The bill further stated, that the notes given for the land had been assigned, and suit instituted by the assignees, and prays an injunction.

The answers state, that they know nothing of the consideration of the notes, or any fraud of Davis, and require full proof. The answer of the assignees further stated, that said notes were assigned to Granville S. Pierce, by said Davis in his lifetime, before they were due, for a valuable consideration, to wit, for eighteen valuable slaves, sold to said Davis, for said notes, by said Pierce; that said Pierce had no notice of any equity between the parties at the time of said transfer ; that said Pierce, with a view to be perfectly safe, before he agreed to receive said notes, and before he

# DECEMBER TERM, 1840.    565

Hamer, et al. *v.* Johnston, et al.    Marshall *v.* Morton, et al.

traded for them, went to Hamer and Marshall, with a view to ascertain whether he could trade for the notes with safety, and asked them if the notes were good, or would be paid by them. They assured Pierce that there would be no difficulty about the notes ; that they were good, and would be punctually paid when they fell due; that thereupon Pierce, upon the assurances so made to him, purchased the notes. It further appeared in proof, that Pierce kept the trade open, and did not close it with Davis, until he could see Hamer and Marshall, and receive the above-stated assurances, and that upon said assurances, he closed his contract with Davis. There was no affirmative allegation or proof, that Hamer was informed that Pierce was about to purchase the notes, at the time the assurance of payment was given. Complainants alleged, that, at the time they made their assurances and promises to Pierce, they did not know of their defence against the notes, and that it had subsequently come to their knowledge ; that said assurances were made in good faith, and without any intention to defraud or deceive. It was further proved by Pierce, that the notes were assigned to him before they were due, for the above-stated consideration, and without notice of any defence.

The answers further alleged, that the present holders of the notes took them upon the representations of Pierce of the assurances of the makers, that the notes were good and would be paid. Pierce was examined as a witness, and stated, that he thought the assurances of payment were the inducement with the present holders of the notes to take them, but also thought the notes would have been purchased by the present holders without said assurances.

*Holt*, for complainants.

The fraud charged to have been committed by Davis, upon complainant, is fully established by the testimony, and if the holder of the note occupies no stronger position in this controversy, than Davis himself would had he never transferred the paper, complainant is certainly entitled to a decree perpetuating the injunction and rescinding the contract.

Complainant, under the statute, has the same right to impeach the consideration of the note in the hands of Morton, that he

would have, were it held by Davis. Has he done any act, which in law, will amount to a waiver or forfeiture of this right ? It is confidently insisted that he has not.

It is true that Pierce, the assignor of Morton, and assignee of Davis, when about to purchase the note, asked complainant if it was good, and was assured by him that it was, and would be punctually paid, and that he afterwards traded for the note on the faith of this assurance. But it is denied that this assurance, thus given, will deprive complainant of that protection against fraud and overreaching, which the statute referred to has thrown over the makers of commercial paper. Before such a representation can work a forfeiture of his rights under the statute, it must be shown affirmatively by the party insisting on such forfeiture :

1. That complainant, when he made the representation, *knew it to be false*, was conusant of the fraud which Davis had practised upon him, and concealed it.

2. That complainant, at the time he made the representation, was fully aware that Pierce was about to purchase the note upon the faith of it.

3. That not merely Pierce, but that Morton, the present holder of the note, confided in the assurance of complainant, that it was good, and was induced thereby to purchase it.

Judge Tucker, in his "Commentaries," lays down the principles contended for, in the following clear and forcible language :

"If, before the assignee takes an assignment, he applies to the obligor, informs him of his design to buy, and requests to be informed if he has any objection to payment; if the obligor is aware of his equity, and conceals it, he cannot afterwards set it up against the assignee, who has been thus induced by his representation and fraudulent conduct to pay his money for the bond. In the case put, the obligor is supposed to know of his equity, and to have concealed *it*. Suppose, however, he *did not know it*, shall he lose his equity (previously existing) by his promise of payment ? I think not. He loses his equity only by reason of his fraudulent concealment, and where he did not know of it, he can have been guilty of no fraud and shall come to no loss." 1 vol. title *Assignment*, c. 25.

In *Honore* v. *Dougherty et al.*, 4 Bibb, 280, the assignee of a promissory note sought to recover against Pope, the surety, on the ground that he had made to him, when about to purchase the note, assurances that it was good. It was shown, on the part of Pope, that when this assurance was given, he was ignorant of the fraud which had been practised upon his principal. It was held that a representation, made under these circumstances, although it superinduced the purchase of the note, could not be made the basis of a liability. "It is," say the court, "in fact, nothing short of an attempt to charge a man for telling what he knew when requested, because he did not know more."

*Shreve* v. *Olds*, 2 Marshall, 141, 142, is a leading case in Kentucky. The obligor in the bond had induced the assignee to purchase it, had renewed it to a creditor of the obligee, and had made repeated promises of payment ; never disclosing that the consideration of the instrument was vicious, although this fact was well known to him. It was determined that he could not be relieved ; and the court, in giving its opinion, base it upon the ground that the obligor " with full consciousness of his legal exemption from liability, promised payment."

*Buckner* v. *Smith*, 1 Wash. 296 ; Hoomes, executor of *Elliot* v. *Smock*, 1 Wash. 389, are to the same effect ; and all subsequent adjudications in Virginia have conformed to them. In the first, the obligor not only gave assurances of payment to the assignee, and thereby induced him to purchase the bond, but he concealed from him the legal objections which existed to its payment, and persevered in such concealment until after there had been a judgment at law by confession. The court held him bound because of this fraudulent concealment, at a time when common honesty required that he should have disclosed his defence. In the other case, there was the same concealment by the obligor of his defence to the bond. He influenced the assignee to buy it, renewed it without making known his objection, and afterwards suffered a judgment to pass at law. As a previous knowledge of his defence was brought home to him, his conduct was very properly held to be fraudulent, and relief denied him.

In *Lomax* v. *Picot*, 2 Rand. 271, where the drawer of a note

had induced another to take an assignment of it, assuring him it would be paid, and it turned out that the title to the property for which the note was given was defective, the drawer was held liable, because he made the assurance with a full knowledge of all the facts connected with his title, and he was bound to know the law arising upon those facts.  " If the appellee knew at that time that the title might prove defective, and, notwithstanding, gave the promise, it would be a waiver of his equity, as that promise induced the purchase of the note." All the judges, in delivering their opinions, trace the drawer's liability to his knowledge of the facts which rendered his title defective ; and although it is not declared in so many words, yet the inference is irresistible, that he would have been discharged, had he been ignorant of these facts, at the time he made the promise of payment. The case of *De Costa* v. *Shrewsbury*, 1 Bay. 211, is a stronger authority in favor of the position assumed, than any which has been cited from Kentucky or Virginia.

The extent, to which third persons shall be held responsible for representations made by them in regard to the subject-matter of contracts in progress between others, has been a fruitful source of discussion and adjudication in England and America. The case at bar is obviously of that character. So far as I have had access to the decisions upon this subject, they uniformly hold, that a party making such representations is not liable, unless he made them fraudulently, and with a knowledge of their falsehood.

In the great case of *Pasley* v. *Freeman*, 3 T. R. 51, this question was elaborately argued by the judges, and settled upon grounds which have never since been disturbed. That was an action against the defendant for having given a false representation of the credit and circumstances of a third person to the detriment of the plaintiff. It was determined, that the ground of such an action is the intention to injure and deceive the plaintiff, and that to entitle him to recover, it must be proved that the representation was false ; that the defendant making it knew it to be so, and he made it with a fraudulent intent. The principle of this decision applies without qualification to the case at bar. Pierce finding the note of complainant in the market, and being desirous of purchasing it from

Davis, applies to complainant to know whether it is good.   Complainant assures him that it is ; and he buys upon the faith of this assurance.   Complainant was no party to the contract in progress between Pierce and Davis ; he sustains to them, and to the transaction, the relation of a neutral third person ; precisely the relation sustained by the party who made the representation in *Pasley* v. *Freeman.*   It is not enough, then, for Pierce, or his assignee, to urge that the' representation of complainant has been confided in, and that great loss must ensue if the contract be cancelled.   The same argument was pressed in vain in the case referred to.   Defendant must go one step further, before liability is made out.   To credit given, and loss suffered, the all-important ingredient of fraud, alleged and proved, must be added.   2 Stark. Ev. title *Deceit ;* 7 Vermont, R. 70 ; 13 Vesey, 131 ; 6 J. R. 181 ; 6 Cowen, 346 ; 2 Wend. 385 ; 7 Ibid. 1 ; 2 East's R. 92 ; *Irwin* v. *Shirrell,* Taylor's R. 1 ; 3 Rand. 410 ; 3 Bos. & Pull. 367 ; 8 John. 23.

Equally analogous to the one under discussion, is that numerous class of cases, where a man having title to, or a mortgage upon, an estate, stands by, and either encourages or does not forbid its purchase, or the predication of loans, or erection of improvements upon it ; he is bound by such conduct, as a just punishment for his concealing his right ; by which an innocent man is drawn in to lay out his money.   All the cases, however, when examined, will be found to fix the party's liability upon this basis ; that he knowingly and fraudulently concealed his title or mortgage, at a time when it was his duty to have disclosed it.   Fonb. Eq. B. 1, ch. 3, sec. 4, note.   In *Dyer* v. *Dyer*, 2 Ch. Ca. 108, Lord Chancellor Finch held, that if the party be ignorant of his title, his silence, under such circumstances, will not compromit his rights.

*Ainslie* v. *Medlycott*, 9 Vesey, 13, was a bill filed by a husband to have his wife's portion, part of which was in stock, made up money, on the ground either of express contract, or representation. The bill was dismissed, because the representation though untrue, and probably the inducement to the marriage, proceeded not from fraud, but mistake.

In *Burrows* v. *Locke*, 10 Vesey, 474, 475, the defendant had expressly represented to complainant, that C. had an undoubted right to make an assignment to the amount of two hundred and eighty-eight pounds, well knowing that he had no such right. Complainant acted upon the faith of this representation.    The defendant sought to excuse himself by alleging, that, although he had received information contrary to what he had represented, he did not recollect it.

The Chancellor in that case decided that :

" To make out a case of this kind, it is necessary to prove only, 1st. That the representation is false.    2d. That the person making the representation had a knowledge of a fact contrary to it."    See also 6 Vesey, 181, 182, 183, *Evans* v. *Bicknell,* where the position insisted on is laid down with singular clearness and force. *Dolbair* v. *Dolbair,* 16 Vesey, 125.

In *De Mannville* v. *Compton,* 1 Ves. & B. 355, a party to a marriage settlement was sought to be held responsible for a note of hers, of two thousand pounds, which it was alleged had been fraudulently cancelled, after it had been represented as constituting a part of the wife's fortune, on the treaty for the marriage.    Relief was denied, because it did not appear that the marriage took place on the faith of the representation, and because there was no ground to infer fraud.

In *Pearson* v. *Morgan,* 2 Bro. C. R. 389, A., the owner of an estate charged with eight thousand pounds in favor of B., was applied to by C., who was about to lend money to B., to know if the eight thousand pounds was still a subsisting charge on the estate.    A. replied that it was ; and C. lent his money accordingly ; it appearing afterwards that the charge had been satisfied, it was held that the money lent was a charge on the lands in the hands of A.    But upon what principle ?    Upon the ground that A., when he represented the charge as subsisting, had express notice that it had been satisfied.    The learned judge, in delivering his opinion, uses this language :

" It is always considered as a constructive fraud, when the party knows the truth and conceals it.    I think, that here James Butler (the owner of the estate) knew of the proviso and advancements,

and that, in this Court, he was bound to take notice of them ; in fact, he had express notice, and it is not like the case of a later deed referring to a former one. He having admitted the lien to be in existence, is bound by his admission, as he had full notice, and induced the plaintiff to lend his money."

The cases examined above are cited by Judge Story in his treatise on Equity, 1 vol. 202, as supporting the proposition, "that it is wholly immaterial, whether a party misrepresenting a fact knew it to be false, or made the misrepresentation innocently, by mistake."

With deference to the learned author, these cases, and the reasoning upon which they proceed, fall far short of sustaining the position which he has assumed. Instead of treating the *scienter* as immaterial, they invariably present it as the only legitimate basis of responsibility. In 9 Mod. R. 56, it was held, that wherever anything in order to a purchase is publicly transacted, and a third person knowing thereof, and of his own right to the lands intended to be purchased, and doth not give the purchaser notice of such right, he shall never afterwards be permitted to set up such right to avoid the purchase.

In *Evans* v. *Llewellyn*, 2 Bro. C. R. 150, it was determined, that a conveyance obtained from a person uninformed of his rights, will be set aside, though there is no actual fraud or imposition. In *Neville* v. *Wilkinson*, 1 Bro. C. R. 543, also cited by Judge Story, Neville was deeply embarrassed, and being about to marry an heiress, to whose father he had represented that his debts did not exceed eighteen thousand pounds, he prevailed on the defendant, a large creditor of his, to conceal from the father the amount of his claim ; alleging, that if it should become known to him, the match would be broken off, and he himself involved in ruin. The defendant, accordingly, though present when the articles of settlement were drawn up and executed, actively concealed the existence of his debt. He afterwards attempted to have it satisfied out of the fund provided by the settlement for the payment of Neville's debts. It was held, that he was entitled to no relief. He was conusant of his claim, and deliberately suppressed it, at a time

572 SUPERIOR COURT OF CHANCERY.

Hamer, et al. *v*. Johnston, et al.  Marshall *v*. Morton, et al.

when, in common honesty, he was bound to have made it known. What countenance does this decision give to the position that misrepresentations made by mistake and those made by design, stand upon the same footing ?

The same question may be asked in relation to Carr *ex parte*, 3 Ves. & B. 110, 111, 112, where the whole train of the Chancellor's argument presupposes, on the part of him making the representation, knowledge of its falsehood.

In *Steward* v. *Luddington*, 1 Rand. 405, 406, 407, Luddington, under a *mistaken supposition*, that a particular slip of ground was vacant, located a warrant upon it.  Lockhart, under patents, afterwards claimed the land, and, upon running his lines, the surveyor gave it as his opinion, that they could not be extended, so as to embrace the slip entered by Luddington, whereupon Lockhart *abandoned all claims to the land* in question, and Luddington, *on the faith of this abandonment*, went on to perfect his title, procured a patent, and sold to Perkins, who sold to C., who sold to N. It was afterwards discovered, that Lockhart was *mistaken* in supposing that his patent did not cover the strip of land entered by Luddington, and suit was brought to recover it.  Held, that neither Lockhart nor his assignee was bound by an abandonment of his claim, thus made under a mistake.  " The transaction," says the Court, " has nothing of the character of a contract, there being no consideration passing between the parties, and if there had been a contract, under the circumstances, it would not have been binding, being made upon an erroneous opinion of Lockhart, in relation to his rights.  "Nor on the ground of fraud was he bound ; no concealment or misrepresentation can have that effect, unless it be collusive or fraudulent, or the negligence be so gross, as to amount to proof of fraud."

Misrepresentation, *without design*, is not sufficient for an action ; it must be made in *bad faith*. 2 Kent, Com. 490 ; *Green* v. *Price*, 1 Munf. 449 ; 1 J. C. R. 344 ; 7 J. C. R. 201.

The distinction between representations made by parties to a contract, and those made by third persons, should never be lost sight of.  The former may, with much show of justice, be required to make their representations good ; whether innocently or fraud-

DECEMBER TERM, 1840.                573

Hamer, et al. v. Johnston, et al.   Marshall v. Morton, et al.

ulently uttered, because *they are paid for doing so.* A valuable consideration passes to them, on the faith of such representations ; and if they prove untrue, in making compensation, they do but return that which in conscience belongs to another. Not so with third persons. They act *without consideration*; have no connection with the contract, which may be influenced by their representations, and are *without motive* to *fraud* or *falsehood.* Thus circumstanced, no principle of law, sound morals, or of public policy, will hold them responsible for *mere mistakes*, honestly committed. To establish a different rule, would be to place a padlock on every mouth in the land. Men would fear to answer the most ordinary inquiries, touching their business and interests, lest they should incur pecuniary liability.

The only authority cited by Judge Story, which seems to sustain his position, is Marshall, Ins. B. 1, c. 10, s. 1. The author, however, is treating not of representations made by third persons, but of those made by the *parties to the contract of insurance.* " The contract of insurance," says Mr. C. J. Kent, " is formed upon principles peculiar to itself, and the common-law maxim of *caveat emptor* has no application, and professes to have none. The insurer is essentially *passive*, and is known to act, and professes to act, upon the information of the assured." Volume 2, Com. 488, note.

It is only in insurance cases, that even parties to contracts are generally held responsible for misrepresentations made by mistake, and their responsibility, in that class of cases, rests upon grounds distinct and anomalous in their character. But third persons would not be held liable for representations, innocently though untruly made, in regard to the subject-matter of a contract, even of this favored class.

No effort, it is supposed, will be made to give to complainant's representation the character of a contract. If a contract, it is void, for want of consideration, and because made in utter ignorance of the all-important fact, that he then stood legally discharged. Ignorance of the law, will not impair the obligatory force of contracts, but ignorance of facts, always, will. " To make a receipt in full of all demands a conclusive bar, it must be given with full

knowledge of all the facts." Esp. N. P. 156, 174. Complainant, if his representation amounted to a contract, would stand in the situation of a party to a bill of exchange or promissory note, who, being discharged for want of notice, is ignorant of such discharge, and promises to pay. It is held, in all the authorities, that such promise cannot be enforced. It is not for the defendant, when sued on such a promise, to show, that when he made it, he was ignorant of his discharge, but it is for the plaintiff to prove, affirmatively, that he had knowledge of it. 16 Johns. R. 152, 153, 154. The reason why such promises are not binding, is, that the defence resulting from want of notice is sufficient, unless it has been waived, and that the party cannot be construed to waive that of which he has no knowledge. A contract implies necessarily the assent of at least two minds. Can the mind, upon any principle of interpretation, be supposed to assent to that of which it was utterly ignorant? Complainant did not promise to pay the note to Pierce; he merely assured him that it would be paid. The note upon its face said as much. How could complainant be regarded as promising payment specially to Pierce, when he was not even apprised of his intention to buy the note? Must not contracts be mutually obligatory, to be valid? If complainant was bound by his promise to pay, what was Pierce bound to do, in return? Nothing. He might buy the note or not, as he chose.

No decision (the *nisi prius dictum* in 2 Yeates, deserves not so respectful an appellation) has attempted to place representations, of the kind under discussion, on the footing of contracts.

We think it fully established by the authorities, that complainant cannot be deprived of his rights of defence under the statute, unless it be proved affirmatively, by the defendant, that the assurance of payment was given to Pierce, with a knowledge that the consideration of the note had failed. Defendant has not attempted to fix upon complainant any such knowledge. Fortunately, however, complainant has been enabled to show, that he remained in ignorance upon this subject, up to the maturity of the note; that he went to the bank for the purpose of paying it, and was then, for the first time, apprised by the cashier, Hughes, of the fraud which

# DECEMBER TERM, 1840.                 575

Hamer, et al. *v.* Johnston, et al.    Marshall *v.* Morton, et al.

Davis had practised.   The note fell due 1 – 4 January, 1838, and the assurances to Pierce were given some time in the month of February, 1837.   It does not appear that complainant had any notice of the transfer of the note until its maturity ; nor is it clear that even then he was apprised of it, as it is not stated that the note was exhibited, during the conversation between him and the cashier of the bank.   He may not have had notice of the assignment until the institution of the common-law suit.

2d.  It must be shown that complainant, at the time he made the representation, was fully aware that Pierce was about to purchase the note, upon the faith of it.

Until the person interrogated is informed of the purpose of the inquiry, he is not bound to make, nor is the other party entitled to claim, a full and faithful representation.  If the inquiry be prompted by idle curiosity, the person addressed may remain silent, may answer evasively, or even untruly, without incurring legal responsibility.   The law, in requiring that the person interrogated shall be distinctly advised of the object for which the information is sought, intends not merely to protect the interests of him who asks, but of him who answers, the question.   It intends he shall be informed that credit is about to be given, and contracts entered into, upon the faith of the representation he shall make ; in order that, being thus admonished, he may respond with  deliberation, with caution, and with scrupulous regard to truth.   In this requirement there is great wisdom.   It proceeds upon the idea, that the citizen shall not be entrapped into a sacrifice of his rights in an unwary moment, by words which, though lightly and heedlessly spoken, may be artfully treasured up ; but that, on the contrary, if those rights are sacrificed, it shall be in a moment of consciousness, and be the result of a deliberate design, formed in the midst of solemn and prescribed warnings.   It is not the naked language to which the Court look, but the intent of the party speaking.

The Court of Appeals of Kentucky, in *Casey* v. *Montgomery* and *Allen*, 1 Marshall, 467, has condensed the law upon this subject with great force and accuracy.   " Expressions," says the learned judge, " of that sort, which may have escaped an individual in relation to his contracts or transactions of any kind,

576 SUPERIOR COURT OF CHANCERY.

Hamer, et al. *v.* Johnston, et al. Marshall *v.* Morton, et al.

should be cautiously received, where they are to be made the basis of liability. It is the deliberate will and intention of the person uttering words, and not their naked verbal import, that ought to subject him. In such case, the person making the representations should be apprised by the person to whom they are made, of the purpose for which they are required. They should be made deliberately, and with a consciousness on the part of the person making them, that they will be confided in by the person to whom they are made."

We may safely defy the production of a single case in which the drawer of a note, or the obligor in a bond, has been deprived of his legal rights of defence, in consequence of representations made, unless he was distinctly informed by the party applying to him for information, that the note or bond was about to be purchased on the faith of his statement. Judge Tucker, in his Commentaries, as already quoted, says : " If, before the assignee takes an assignment, he applies to the obligor, and informs him he is about to take an assignment of his bond," &c. So in the favorite case of defendant's counsel, 16 Serg. & Rawle, 18, the Court say: " It has been held, that if the assignee calls on the obligor, and informs him he is about to take an assignment of his bond, if the obligor acknowledges that it is due, without any allegation of defence," &c.

In Sugden on Vendors, 10, we are told, that if a purchaser suspects any person has a claim on the estate which he has contracted to buy, he should inquire the fact of him, at the same time stating that he intends to purchase the estate ; and if the person of whom the inquiry is made has an incumbrance on the estate, and deny it, equity would not afterwards permit him to enforce his demand against the purchaser.

The rule which holds a third person liable for assurance given in relation to the subject-matter of a contract in progress between others, supposes such person to be present at, or conusant of, the treaty in which the fraud is practised, and encouraging the purchaser either in express terms, or by silence and concealment of his own title, to proceed in the purchase. 5 Call, 471. In *Ibbottson* v. *Rhodes*, 2 Vernon, 554, a mortgagee being asked by the

DECEMBER TERM, 1840. 577

Hamer, et al. *v.* Johnston, et al.   Marshall *v.* Morton, et al.

agent of a person about to lend money on an estate, whether he had any incumbrance on the estate, answered that he had not. The Lord Keeper directed an issue at law, to try whether the agent told the mortgagee his employer was about to lend money on the estate. This issue would have been wholly superfluous, if the bare naked falsehood had been a sufficient ground for postponing the demand of the mortgagee.

In 9 Madd. 36, already cited, it was expressly adjudged, that the party concealing his right, to be bound by such concealment, must have notice, that third persons are contracting in reference to the subject-matter of such right. Until this notice reaches him, the duty of disclosure does not arise.

In 1 Bro. C. R. 357, 358, Lord Thurlow made this emphatic declaration : " This Court never binds a third person, but where there is notice of a treaty. There is no case in the books, but where the party, to whom the fraud is imputed, was conusant of the treaty in which the fraud was practised."

If the party sought to be charged, in consequence of a representation made, was not conusant of the treaty in which the fraud was practised, nor in any manner, nor for any fraudulent purpose, confederating with the person committing the fraud, he cannot be held liable. Fonbl. Eq. 137, 138, ed. 1835.

We ought not to take for a consent of the creditor to the alienation of his pledge, the knowledge which he may have of it, nor the silence which he keeps after he knows of it, or if he knows that his debtor is about selling a house, which is mortgaged to him. But in order to deprive him of his right, it is necessary that it appear by some act, that he knows what is doing to his prejudice, and that he consents to it. And a creditor does not lose his mortgage by his consent, except when it appears, evidently, that his intention is to release it, or that there be grounds to charge him with dishonesty, for not having declared his right, when he was under an obligation to do it. Domat's Civil Law, 1 vol. 364, B. 3, T. 2, sec. 15. " Now, I take it, that nothing will amount to a confirmation of a fraudulent transaction, but an act done by the party, after he has become fully aware of the fraud that has been practised. He must be aware that the act he is doing, is to have

the effect of confirming an impeachable transaction." Schoales & Lefroy, vol. 2, 486. Complainant was not aware of the fraud practised upon him by Davis, and of course could not have intended to ratify it. His representation should, therefore, not have that " effect."

Tested by this rule, so well established by reason and authority, the conduct of complainant commits him to no responsibility. Davis perpetrated a fraud upon Pierce, by selling him a note which had its origin in the grossest swindling. But was complainant, at the time he gave the assurance of payment, apprised that a treaty was going on between Davis and Pierce for the purchase of the note ? Did Pierce, when he asked him if it was good, inform him that he was about to buy it ? We answer in the negative. No such fact appears in the record, by averment or proof ; and *de non apparantibus, et de non existentibus, eadem est lex.* Pierce, who alone testifies to this point, seems to have had but one interview with complainant, and to have asked but a single question, " was the note good, and would it be paid ? " He was assured in reply, that it was good, and would be paid. This is all that appears to have transpired between them. No explanations were made on either side. Had complainant been approached in the manner required by law, had he been distinctly informed of the object of Pierce in making the inquiry, how different might have been his response ! Instead of answering flippantly and carelessly, what he probably considered an idle, if not an impertinent interrogatory, he might have paused, reflected, reviewed the whole transaction, advised Pierce of the consideration of the note, and in the spirit of caution and circumspection, which he would doubtless have felt, might have so qualified his answer as to have protected at once his own interests and those of Pierce, from the fraudulent machinations of Davis.

The record furnishes neither allegation nor proof that complainant was aware of the intention of Pierce to buy the note, or that a contract for that purpose was in progress. A representation thus made, ought not and cannot bind.

3d. It must be shown, that not merely Pierce, but that Morton,

the present holder of the note, confided in the representation made by complainant, and was induced thereby to purchase it. Fraud and damage must concur to give a right of action. 3 T. R. 51, *Pasley* v. *Freeman.* The party must be misled by the representation, and act under its influence, or he cannot complain. 1 Story's Eq. 212. The contract must have taken place on the faith of the representation. 1 Ves. & B. 335.

In 16 Serg. & Rawle, 18, a case relied on by defendant, the Court say : " The question is, was Ann Fox induced to purchase the bond under the representation made by Werner (obligor) that he had no defence, and that he was willing and desirous that the bond should be sold in the neighborhood ? If this should be the opinion of the jury, they will find against the obligor."

In *Cowen* v. *Simpson*, 1 Esp. C. 290, the defendant was held not liable for a fraudulent representation made by him, because it was shown that plaintiff had not acted upon it, but upon a similar representation made by another. 2 Starkie's Ev. title *Deceit.* All the cases, without exception, proceed upon the ground, that the drawer of the note, by his representation and assurances of payment, induced the assignee to purchase it. Unless this influence was successfully exerted, there can be no responsibility. Has Morton shown that he purchased the note on the faith of complainant's assurance to Pierce ? It is true, that this assurance was communicated to him, but this may have been done and yet the assurance not have constituted the controlling motive to the purchase. The only witness who speaks to this question is Pierce himself. Having deposed that, when about to sell the note to Morton, he stated to him complainant's assurance, " that it was good and would be paid ; " he is asked whether Morton was not influenced by that statement to buy the note ? His answer is so unique that we cannot forbear quoting its very words. " I think," says the witness, " the statement alluded to was the inducement to the taking of said note. I think he would have taken the note any how."

The witness does not undertake to make any positive declaration in relation to the motive which operated upon Morton. He

gives us his impressions ; his thoughts.   He thinks Morton was induced to buy by the statement, and he thinks he would have bought " any how."    These thoughts are in direct conflict, and neutralize each other.    It is a matter of demonstration, that if Morton would have bought the note " any how," he acted under some other influence, probably some preëxisting determination, and not under the influence of the statement referred to.    Perhaps he was a " shaver," a speculator in commercial paper ; and perhaps complainant's note was offered to him at so tempting a discount, that his cupidity could not resist the bait.    Perhaps his eagerness and resolution to buy, running all hazards, may have been manifested to Pierce, who may have availed himself of this feeling, to pass the note off " without recourse."    Doubtless the feelings of Morton upon the subject were well known to Pierce, and, in full view of them, his opinion is, that the note would have been purchased without any statement as to complainant's assurances.    We insist, therefore, there is no proof whatever that Morton became the holder of the note on the faith of complainant's representation.    The law, however, requires that the proof to this fact should be most distinct and conclusive, because *it is the gravamen* of the defence.

Even if the testimony to this point were clear and irresistible, there is no allegation in the pleadings, under which it could be received, or considered of.    It is worthy of all remark, that Morton nowhere avers or intimates, that he purchased the note on the faith of complainant's representation or assurance of payment.    It was obviously an all-important averment, and would doubtless have been made, could it have been done with safety, or with proper regard to truth.    He well knew that he concluded the trade under other influences ; and, hence, he endeavors to shelter himself under the confidence reposed, not by himself, but by Pierce, in the assurances of complainant.

In 12 Wheat. 181, Mr. Chief Justice Marshall lays down the rule contended for, in this explicit language : " That a decree must be sustained by the allegations of the parties, as well as by the proofs in the cause, is too well established to be disregarded."

In 1 Bibb, 316, it was held that evidence, to merit the attention

of the Court, must be relevant, and illustrative of some point presented by the pleadings.

It was adjudged in *Morrison's* exe'rs v. *Hart*, 2 Bibb, 6, 7, that " a fact not alleged, can no more in a court of equity, than in a court of law, constitute a basis upon which an adjudication may be made, it being equally true that the Chancellor, as well as the Judge, must decide according to the allegations of the proof."

It not being alleged in the answer, or in any part of the pleadings, that the purchase of the note was made by Morton, under the influence of complainant's representation, there is no issue made upon that point, and however convincing might be the testimony, it would have to be rejected as irrelevant.   The decree in this cause, resting upon the assumption that there was not only averment but proof to this point, cannot be sustained.

This is not a technical or formal objection, but one supported by a rule of practice and pleading, as ancient as the common law itself.

It will, however, be conceded, we presume, that Morton did not purchase on faith of complainant's representation, and his right to a recovery will be based on the ground, that Pierce, his assignor, thus bought, and that he is entitled to Pierce's equity against complainant.   Had Pierce transferred the note in the ordinary way, remaining liable as indorser, it might be urged with some plausibility, that, to make his equity available as a protection to him, it should enure to the benefit of Morton, who might, under its cover, have judgment and satisfaction of the drawer, thereby discharging Pierce from his responsibility.   But the assignment is made " without recourse," and Pierce states, that he has no interest whatever in the note, or in this suit.   Let the decree be for or against complainant, Pierce is saved harmless. The equity of Pierce, if it existed at all, was personal to himself; it arose out of the fact that he purchased the note, and laid out his money, because of complainant's assurances of payment.   It might be against conscience for complainant to insist on a failure of consideration against Pierce, but certainly, as against Morton or others, who purchased the note without trusting to or being

influenced by these assurances, he might impeach the note with perfect propriety. For, between them and complainant, there exists no such relation as obtains between Pierce and complainant; and the equity, to which this relation could alone give rise, must be wanting. If Morton bought the note upon his own judgment, and upon his own calculation of the chances of payment and profit of the trade, unpersuaded and uncontrolled, by complainant, or his conduct, neither law nor good morals would require, that the latter should be deprived of his statutory rights of defence.

A. sells a horse to B., representing it to be sound, and B. sells the same horse to C. without any such representation. It is afterwards discovered by C. that the horse is unsound, and was so at the time of the sale by A., and that A. had knowledge of the unsoundness. Will it be contended, that C. could maintain an action against A. on this representation, not made to him, and not influencing his purchase ? To state the question, is to answer it in the negative. But, to make the case more analogous to the one at bar : A. is about to sell the horse to B., but declines making any representation as to its soundness. B. inquires of C., who once owned the animal, as to its condition, and is assured that it is perfectly sound, upon the faith of which assurance, he makes the purchase. B. sells to D., who buys at his own risk, without exacting any representation of soundness. It is afterwards ascertained, that the animal is diseased, and was so when sold by A., and that C. was conusant of the fact. Upon what principle of law, or morals, could it be said that D., the dealer at arms length in the market, might have his action against C. ? There would be fraud in C., but no damage to D., resulting from that fraud ; for C.'s representation was not addressed to him, and did not influence his purchase. Suppose that, in each of these cases, instead of a representation, there had been a warranty, based upon a valuable consideration, and the party, to whom the warranty was made, had sold the horse without warranty. The principle would be the same, and the person buying without a warranty could not avail himself of the warranty made to others who had previously owned the property. For although covenants of warranty follow real es-

tate, the rule is different in regard to personalty, because in relation to personalty there is no privity of estate as there is in the case of realty.   Tucker's Com. tit. *Covenant*, 124.

This principle has a manifest application to the case at bar. *Caveat emptor* is a maxim of the common law, applying most strictly to a man who buys a *chose in action*, or, in other words, a suit ; and unless he has protected himself by a contract of warranty or a representation, on the faith of which he acted, he runs all hazard, and, in the event of loss, is without redress.   If others, more wily and cautious, have previously owned the property, and protected themselves by such contract or representation, it is no protection to him.   Tucker's Com. 336.

The statute places the holder of a promissory note in the shoes of the payee, not in the shoes of any intermediate assignee, who may have strengthened his position by some equity, peculiar and personal to himself.

For whose protection is complainant to be deprived of his rights of defence, under the statute ?   Pierce asks no protection ; he is beyond the reach of loss, terminate this controversy as it may. Morton, a speculator in the market, buying without warranty, and influenced by no representation of complainant, is entitled to no protection, at least, at the sacrifice of one who has committed upon him no fraud, made with him no contract.

The statute authorizing the makers of commercial paper to impeach its consideration, in the hands of *bonâ fide* assignees, is, it is confessed, anti-commercial in its spirit; but it is eminently adapted to the habits and pursuits of the people of Mississippi, who are not merchants, but tillers of the soil.   They have displayed, in this enactment, an ambition above that of " the shop-keeper," an ambition which seeks the true glory of a State, in the advancement of principle, and the interests of sound morals, rather than the miserable aims and selfish policy of mere trade.   In thus worshipping at the shrine, rather of *justice*, than of mammon, they have chosen the better part, and, in despite of the bribery of their spoils, have given craft and fraud a stern and sublime rebuke.   No disposition should be felt to cripple or curtail the operation of this statute, nor should the rights which it solemnly and anxiously guards,

be sacrificed to words, lightly and unconsciously uttered, and which, for aught that appears, passed by the holder of this note as the idle wind, influencing him to no contract, and visiting upon him no loss.

*George S. Yerger*, for defendants.

The complainants executed their several notes to Willie Davis, for lands, which he represented he purchased from the Indians, under the 14th article of the treaty of Dancing Rabbit Creek ; Davis made a bond for title; but, from the evidence in the cause, it appears he never had any title.   Davis, before the notes matured, assigned them to G. S. Pierce, who assigned them to defendants.   The bill seeks to enjoin their collection, upon the ground of failure of consideration.   The defendants prove by Pierce (who is released), that before he traded for the notes, he went to Hamer and Morton, and requested to know of them, whether they had any defence to the notes, and that they both assured him that they were good notes, and no difficulty about them, and assured him that they would pay said notes punctually, and that, in consequence of that assurance, he traded for them."

The complainants filed an amended bill, in which they admit the above statement, but allege, at the time they made it, they were not aware of the fact, that Davis had defended them.   Upon these facts, the question is, whether they must pay the notes or not.

1. We insist that, although the case made out might be sufficient to enjoin the notes in the hands of Davis, yet as Pierce, before he traded for the notes, went to the complainants, and they assured him, he should have no difficulty about the notes, and that they would punctually pay them, they cannot, as against him and his assignees, set up the fraud of Davis.   Pierce acted on the faith of their assurance, and parted with his property on the faith of their representation.   It is probable, that they were not aware of the failure of consideration at the time ; but this does not alter the case ; whether they knew it or not, it would be a fraud on Pierce, if they did not now pay him.

2. It is an old and settled principle, that when a man acts on the

faith of a representation made by another, that other shall make the representation good.   1 Story's Eq. 202, 203, in note.

But the precise point has been decided in several adjudged cases, in one or two of which the party did not know.   Vide Bailey on Bills, 549; *Ludrick* v. *Crawl*, and *Carney* v. *Fields*, 2 Yeates's Rep. 464, 541 ; 1 Pennsylvania Rep. 27,·476 ;   16 Serg. and Rawle, 18, 21.

The case of *Pearson* v. *Morgan*, cited 1 Story, 203, in note, is directly in point also, to which case I refer the Court.

CHANCELLOR.   The question presented in this case by the pleadings and proof for decision, is, can a maker of a promissory note, who assures one about to deal for it, when called on by the intended purchaser, to ascertain if there is any objection to the validity of the note, that it will be paid at maturity, set up any defence that might exist between himself and the original payee ?

I incline to the opinion that he cannot.   As between the assignee of the note and the maker, a new consideration has arisen in favor of him to whom the assurance is made.   I will illustrate my meaning by a supposed case.   A. verbally assumes to pay to B. a debt due by C. to B., in consideration that C. would give A. a horse ; here the consideration moving between A. and B. is the horse, that C. has undertaken to give A. ; a consideration with which B. has nothing personally to do, and yet which influences and controls the payment by A.   So in the case before me ; the makers of the notes agree with the assignee, that, in consideration of the agreement by the assignee and their creditor, they will pay the amount of their note to the assignee.   The consideration of the note, as between the payee and the makers, is one thing ; but the consideration, as between the assignee and the makers, a wholly different thing.   It is true, the literal contract of the maker is not that which I have just detailed; but the legal effect of their contract is no other.   By operation of law, the indorsement of the note is a contract between the maker and the assignee to pay the note, according to its tenor and effect; not that any actual consideration has passed between the assignee and maker, but the law transfers the original consideration to the new contract, made by the assignment.   This is a contract

which the law makes in every case of indorsement; and but for our statute upon the subject, the maker of the note would be absolutely, in every such case, bound to pay its amount to an innocent assignee, without regard to the situation or condition of the original consideration. In this case, however, superadded to the original consideration, which exists in every case of indorsement, is the new consideration, arising by direct and not implied contract between the indorser and the maker. The maker has said to the indorsee, you may freely part with your property to the payee ; I will pay you its value punctually. Suppose, in this case, no note had intervened and been in existence ; and the maker of the note had said to Pierce, when about to trade with Davis, I owe Davis so much; you can let Davis have your property; I will pay you the amount you ask; and upon that promise, Pierce had parted with his property to Davis, and sued Hamer, in an action of assumpsit, for the value thereof ; could Hamer plead, that he owed Davis nothing? or that the consideration of the contract by which he *then* expected to owe Davis, had failed, and he *now* owed him nothing? Clearly not; and yet, I apprehend, the fact, that the amount of Hamer's real or supposed indebtedness to Davis had assumed the shape of a promissory note, and was payable at a fixed and stated day, would not alter the character of the consideration between him and Pierce, or in any degree affect the nature of his obligation.

It has, I am aware, been held in Pennsylvania, that where the maker of a note has a good defence against the original obligee, and acknowledges his liability to the assignee, *after* the assignment has been made, he is, nevertheless, not bound by the acknowledgment; and the reason is obvious, because it did not enter into the consideration of the assignment to the new assignee, it formed no inducement with him to take the note, for it was made after he became the holder of it, and so far as it was evidence of any agreement at all on the part of the maker, it was a mere *nudum pactum*, without consideration, and of course not at all obligatory. But in the same State, it has been held, that if an innocent assignee is induced to take an assignment, by reason of a promise on the part of the obligor to pay the note, the taker is concluded from setting up any defence to it. See 2 Yeates's Rep. 464 ; 14 Serg. and Rawle, 304.

I have not been able to see the book last referred to, but the principle is thus broadly stated in Wharton's Digest, without any such qualification as that insisted on by the complainants in this case. In Virginia, where, if I recollect right, they have a similar statute to our own, it was held, in 2 Randolph, 247, that an indorsee, who purchases a negotiable note, without notice of any equity between the maker and indorsee, is not affected by such equity; especially, where the maker, before the assignment, gave assurances to the indorsee, that the note would be fully paid.

But independent of any express adjudication on the subject, I think the unconditional liability of the complainants to the defendants, upon the note, can be sustained upon general principles. Where a party represents a particular fact, upon the faith of which he induces another to deal, he is bound to make that representation good, and it is immaterial whether the party making it knew it to be true or false. The rule is extended so far, that if a party innocently misrepresents a fact by mistake, it is equally conclusive, for it operates equally as a surprise and imposition. 1 Story's Eq. 202, 203. Even ignorance of a party's rights will not excuse him, if he misleads the purchaser by his own misrepresentations, though innocently. The maxim is justly applied to him, that, where one of two innocent persons must suffer, he shall suffer, who, by his own acts, occasioned the confidence and the loss. 1 Story's Eq. 377; 3 Peere Will. 74 (Cox's note) ; Com. Dig. Ch. 4 W. 28; 6 Ves. 173; ib. 182, 183, 184 ; 1 Vernon, Rep. 136. It is a settled maxim of chancery jurisprudence, that where the equity of the parties is equal, the law must prevail, and a court of chancery will not interfere. 1 Story's Eq. 75. The equities of parties is said to be equal, where both are equally innocent, and have been equally diligent. ib. 75. Test this case by the application of these principles, and it must be at once apparent, that the maker of the note cannot, without doing violence to them all, escape from his liability to the assignee. He represented to the assignee, that he might trade for the notes with safety; such, at least, is the fair inference from his express promise to the assignees to pay them the notes at maturity, in view of the assignee's intention to trade for them. He has, then, represented that the notes were good valid and binding notes, and

he must make them so.    But for his assurance, the assignee would not have taken them, and no injury would have followed; but the loss being occasioned by his acts, he must be the sufferer.

It is unnecessary to investigate the case further; the complainants cannot escape the effect of their own conduct.    To permit it, would be to enable them to commit a wrong, and then profit by it.    One or the other of the parties must lose the amount of the note.    I think, upon any and all the grounds I have stated, the complainants must bear the loss.    The injunction must, accordingly, be dissolved.